**SYSTEMS ARCHITECTS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 171–83C.

United States Claims Court.

April 22, 1983.

---

**32.** 42 U.S.C. § 4654(c) (1976).

Joseph S. Wager, Washington, D.C., for plaintiff.

George M. Beasley, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant; Major Samuel Roser, Washington, D.C., HQ, USAF/JACL, The Pentagon, of counsel.

## OPINION

NETTESHEIM, Judge.

This matter is before the court on plaintiff's motion for a preliminary injunction and on defendant's motion to dismiss Count I of the complaint for declaratory and injunctive relief.[1]

## FACTS

All facts recited which do not relate to the procedural posture of this case are taken from plaintiff's complaint and accompanying five affidavits. The court has also drawn upon a later affidavit and a supplemental affidavit submitted by plaintiff. In addition, the factual elaboration offered by plaintiff at oral argument is accepted for purposes of these motions. In ruling on the motion to dismiss, all facts have been considered as well pleaded and viewed in the light most favorable to plaintiff.

With its complaint filed on March 25, 1983, plaintiff Systems Architects, Inc. ("Systems"), also filed a motion for a preliminary injunction restraining the United States Air Force (the "Air Force") from contracting elsewhere for the equipment and services that defendant had committed itself to purchase from Systems under Contract No. SB18210042 awarded by the Small Business Administration (the "SBA")[2] (the "subject contract"). Systems also sought to restrain the Air Force from issuing modifications to or additional purchase orders under contracts with companies other than Systems for the equipment and services covered by the subject contract and from otherwise engaging in bad-faith actions.[3]

The Air Force on January 4, 1982, awarded the primary contract to the SBA for the provision of a Research and Development Automated Management System ("R & D AMS") to support certain management applications within the Air Force Systems Command. The SBA awarded the identical contract to Systems, a small minority-owned business and qualified participant in the SBA 8(a) program, after competition among five firms, pursuant to a SBA section 8(a) set-aside competitive solicitation. 15 U.S.C. § 637(a) (1976). The subject fixed-price/time and materials/multi-year requirements contract required the Air Force to place delivery orders with Systems for design and planning services; construction of facilities at various Air Force locations; negotiation, purchase, and installation of some 48 computers and related equipment; integration of the computer network; and maintenance of the completed automated management system. Performance of the subject contract was to extend over a six and one-half year period, with a total estimated contract price at completion of $22 million.

---

1. On April 15, 1983, the parties filed a stipulation of dismissal without prejudice with respect to Count II of the complaint, which was a claim for breach of contract.

 Defendant's motion to dismiss was styled in the alternative as a motion for summary judgment; however, the affidavits and documents furnished with defendant's moving papers related only to the breach claim.

2. Contract F33600–82–D–0130 was awarded through the SBA.

3. At oral argument Systems asked that its injunctive request be modified to prevent any further improper contract awards in violation of applicable statutes and regulations, rather than the activities hereinabove described.

Among the Air Force's stated goals to be achieved by the subject contract were to acquire and support similar computer systems and to obtain lower prices through a larger procurement. The Air Force advised Systems on September 22, 1981:

4. The R & DAMS project is not absolutely dependent on the continued existence of SAI [Systems]. The "contract negotiation" ... and the "network" [referring to acquisition of computer hardware and related services] ... are the only parts that absolutely require their presence. Once this task is accomplished anything could be separately acquired at no obvious penalty other than potentially higher cost.

5. However, the opportunity to provide a standard system on a long-term basis is the real benefit of the R & DAMS project. It is only the continuing presence of an easy-to-use procurement vehicle that can prevent a proliferation of equipment types. A proliferation that would kill any chance that applications of software will be shared. We want to continue the contract for the duration of the proposed contract life (i.e., six years).

6. Our "fall-back" position if difficulties should arise with SAI would be to order the same equipment and services in a piece meal [sic] fashion at GSA prices. This could be done under the provisions of Federal Procurement Regulation Amendment 211. This would undoubtably [sic] mean higher prices and a vastly increased potential for proliferation. A situation we must avoid.

Although Systems was entitled to the entire procurement of the R & D AMS, other than software development,[4] and delivery orders in excess of $11 million were to be issued to Systems during the first 18 months of the contract term, the Air Force in the first 14 months only directed to Systems a single delivery order in the amount of $248,881.64. However, the Air Force in the interim made its R & D AMS purchases from other companies.

Specifically, Systems claims that approximately $8 million of the $11 million initial 18 months' expenditures was committed to computer hardware. The Air Force approved Systems' plan containing equipment manufactured by Digital Equipment Corporation ("Digital") and other identified suppliers. After the recommendations were adopted, Systems was directed to proceed with the negotiation of its subcontracts for acquisition of computer hardware and the services called for by the R & D AMS program. By letter dated April 27, 1982, the Air Force disclosed to Digital its selection as the subcontractor for the R & D AMS program and engaged in discussions with Digital regarding the status of the Systems-Digital negotiations. Over Systems' objection to this interference with its negotiations, the Air Force on May 4, 1982, directed Systems to conclude the Digital subcontract by agreeing to Digital's offer. Systems complied, believing the ultimate terms of the award were less favorable than it could have obtained absent interference by the Air Force.

On May 31, 1982, however, the Air Force awarded to Digital a basic ordering agreement incorporating the quantities and prices contained in the May 24, 1982 Systems-Digital subcontract. This award was accomplished by the Air Force's Aeronautical Systems Division/Air Force Command, Wright Patterson AFB, Ohio ("ASD"), an agency not involved in the R & D AMS procurement. Apparently, the ASD awarded a second contract to Digital, which Systems claims was intended expressly to place individual orders with Digital for the same equipment and services Systems was to provide under the subject contract. On June 21, 1982, Systems' subcontract was transferred to the ASD. This terminated the Air Force's procurement from Systems. Systems claimed at oral argument that the Air Force had purchased a total of 12 of the 48

4. The Air Force awarded the software complement, also with projected revenues of $22 million, as a prime contract directly to TRW.

computers from Digital—three at the higher GSA schedule rates.[5]

Similar incidents are charged to the Electronic Systems Division, AFSC, Hanscom AFB, Massachusetts, with respect to funding Booz, Allen & Hamilton, Inc., to provide planning and training contemplated under the R & D AMS program.

The subject contract obligated the Air Force to exercise follow-on program year options subject to Congressional authorization for available funding. Instead, on September 29, 1982, the last date to exercise the renewal option and although funding posed no impediment to the second-year program option, the Air Force advised Systems that a basic ordering agreement ("BOA") would be substituted for the subject contract. The substitute, *inter alia,* made placement of R & D AMS program requirements discretionary. Threatening Systems with removal from the R & D AMS program, the Air Force demanded that Systems negotiate the BOA. Systems avers that it executed the BOA, reserving its objections, on December 28, 1982; the Air Force has yet to do so. Defendant stated at oral argument that negotiations looking toward another contractual relationship continue. It suffices to note that both Systems and the SBA timely protested the foregoing actions of the Air Force and that on at least one occasion in August 1982 the Air Force affirmed its commitment to procure through Systems.

Systems' claim concerning sham negotiations [6] flows from cancellation on February 17, 1983, of an unpriced delivery order for computer room engineering design services and an associated Request for Proposals ("RFP") issued to Systems on March 11, 1982, and on which Systems worked through September 17, 1982. Systems' proposal was submitted on September 24, 1982. Thereafter, in the course of price negotiations which ultimately were unfruitful, Systems provided to the Air Force certain information which Systems believes enabled defendant to bypass Systems and purchase the required services and construction directly from Systems' subcontractors. After the termination ensued, Systems believes that the Air Force proceeded to deal directly with Systems' other subcontractors, as it did with Digital.[7]

On February 17, 1983, the Air Force also terminated a RFP for design of a computer room to which Systems had responded on December 23, 1982.

Count I of Systems' complaint asks for a declaration that the award of contracts to companies other than Systems for the same equipment and services covered by the subject subcontract is contrary to public policy, to the public interest in the integrity of the federal procurement system, and to applicable law and for the preliminary relief heretofore summarized.

Pursuant to a telephone conference call held on April 1, 1983, the parties agreed on a briefing and argument schedule, which was memorialized by order of April 5, 1983. The order also denied expedited consideration of Systems' motion for expedited discovery and allowed Systems to file a further memorandum in support of its motion for expedited discovery. A supplemental memorandum in support of Systems' motion for preliminary injunction was filed on April 7, 1983, and defendant's opposition to the motion for preliminary injunction/motion to dismiss followed on April 11, 1983.

---

**5.** The latter group were acquired after the opportunity to renew the subject contract lapsed.

**6.** This claim goes to the .dismissed breach claim, but is also said to illustrate the Air Force's improper procurement activities. See *supra* note 1.

**7.** On March 25, 1983, Systems moved for expedited discovery, which, had it been allowed, may have revealed more specific information with respect to the foregoing factual allega-

tions, including on-going procurements from other contractors for the R & D AMS requirements. On April 12, 1983, the court denied that motion on the ground that substantial jurisdictional questions were presented by defendant's April 8 motion to dismiss the complaint or, alternatively, to enter summary judgment in its favor. However, in ruling on defendant's motion to dismiss, the court has credited fully all of Systems' allegations based on information and belief.

Systems replied and opposed on April 15, 1983, and submitted a supplemental memorandum on April 19. Oral argument on the motion for preliminary injunction and motion to dismiss was heard on April 20, 1983, with defendant then delivering its reply to the second supplemental memorandum.

## DISCUSSION

This court recently described the perimeters of the United States Claims Court's jurisdiction to grant injunctive relief in *Harris Data Communications, Inc. v. United States,* 2 Cl.Ct. 229 at 236–238 (1983) (NETTESHEIM, J.), *appeal noted* (Fed.Cir. Apr. 18, 1983). Here, unlike in *Harris,* the issue for decision with respect to Systems' claim for declaratory and injunctive relief is purely jurisdictional.

In connection with the April 1, 1983 telephone conference call, the court voiced its concern with respect to the impact of *United States v. John C. Grimberg Co.,* 702 F.2d 1362 (C.A.Fed.1983) (en banc), which understandably was not addressed in the motion for preliminary injunction filed two days before the Federal Circuit's decision issued. This subject was among the questions that Systems addressed in its supplemental memorandum of April 7. In *Grimberg* the Federal Circuit defined this court's jurisdiction under section 133(a)(3) of the Federal Courts Improvement Act, Pub.L. No. 97–164, 96 Stat. 25, 40 (1982) (to be codified at 28 U.S.C. § 1491(a)(3)), which provides in pertinent part:

> To afford complete relief on any contract claim brought before the contract is awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief. . . .

*Grimberg* held that the equitable power set forth in section 1491(a)(3) is restricted to complaints filed in this court before award of the subject contract. 702 F.2d at 1376. Following *Grimberg,* Judge Merow in *F. Alderete General Contractors, Inc. v. United States,* 2 Cl.Ct. 184 (1983), read the appellate decision in *Grimberg* to confine jurisdiction to consideration of pre-award contract claims, even if the contract had been awarded subsequent to filing of a lawsuit. 2 Cl.Ct. at 186.[8] *Alderete's* reasoning was relied on in *Big Bud Tractors, Inc. v. United States,* 2 Cl.Ct. 195 (1983) (order denying injunction pending appeal and motion for relief from judgment) (KOZINSKI, C.J.), wherein the contract had been awarded after the trial court's decision denying the injunction and dismissing the complaint.

The reasons underlying these decisions, which are grounded on the Federal Circuit's numerous references to the exercise of this court's power coextensive with the pre-award procurement process, *see F. Alderete General Contractors, Inc.,* 2 Cl.Ct. at 186, are that the United States Claims Court has not been conferred with power that enables it to provide injunctive relief with respect to on-going contract administration once a contract has been awarded. *See United States v. John C. Grimberg Co.,* 702 F.2d at 1368–69.

■ Systems disavows that injunctive relief is sought with respect to the subject contract, but argues that the injunction is directed only to future procurements by the Air Force for the R & D AMS requirements.[9] However, Systems initially moved on the theory that it is within the zone of protection carved out by the progeny of *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970), which have allowed

---

8. The contract in *Alderete* was awarded after a lawsuit had been filed in federal district court and while the case was in the process of transfer to the Claims Court. Respectfully noted is this court's view that the claim had been filed before contract award and, thus, *Grimberg* did not mandate dismissal.

9. While the award of a contract to plaintiff for the R & D AMS program deprives the court of its equitable power to direct that defendant place its R & D AMS requirements with plaintiff pursuant to that contract, no such constraint bans appropriate equitable relief in the improper award of additional R & D AMS contracts that have yet to take place. Plf's Suppl. Memo, filed Apr. 7, 1983, at 7.

non-bidders to challenge procurement actions. While this court is of the view that the legislative history of the Federal Courts Improvement Act expressly demonstrates that Congress intended this court to apply the *Scanwell* doctrine to its fullest extent, *see Harris Data Communications, Inc. v. United States,* 2 Cl.Ct. at 236–38, tension exists between *Scanwell,* a quintessential standing case, and the Claims Court's jurisdiction under section 1491(a)(3), which confines the injunctive power to contract claims that otherwise are within the court's jurisdiction. Thus, the statute reads: "To afford complete relief on any contract claim brought before the contract is awarded . . . ." *Indian Wells Valley Metal Trades Council v. United States,* 1 Cl.Ct. 43 (1982) (WIESE, J.) (*held,* this court's jurisdiction does not extend to suits by non-bidders).

Systems cites *Ballerina Pen Co. v. Kunzig,* 433 F.2d 1204 (D.C.Cir.1970), *cert. dismissed,* 401 U.S. 950, 91 S.Ct. 1186, 28 L.Ed.2d 234 (1971). The D.C.Circuit upheld standing to plaintiffs who challenged the addition of ball point pens and refills to a schedule of blind-made products, which would have frustrated plaintiffs' requirements contracts to supply these items to the Government, 433 F.2d at 1209, based, *inter alia,* on a prima facie showing of a statutory violation, as well as on the legislative history of the statute showing an intent to protect private industries, such as plaintiffs. Systems also offers *Kinnett Dairies, Inc. v. Farrow,* 580 F.2d 1260 (5th Cir.1978), for the proposition that the small-business bidder plaintiff had standing to challenge a procurement decision after the six-month contract term had expired prior to appellate review, because the infractions of procurement regulations sought to be enjoined were certain to be repeated in future procurements and the claim, hence, was not moot. 580 F.2d at 1266. Plaintiff filed its action after contract award.

To date this court's jurisdiction under section 1491(a)(3) could not accommodate either of these cases. Regarding *Ballerina Pen,* a procurement in which plaintiff is a bidder is the predicate to a contract claim in this court in respect of which the Claims Court now can grant equitable relief prior to award. *United States v. John C. Grimberg Co.,* 702 F.2d at 1367 & n. 8 (citing *Keco Industries, Inc. v. United States,* 192 Ct.Cl. 773, 428 F.2d 1233 (1970) ("Thus (a)(3) made an equitable remedy available when a claim over which the court has jurisdiction (implied contract under (a)(1)) is filed in the court before a contract has been awarded.")); *see* 702 F.2d at 1371–72; *Harris Data Communications Inc. v. United States,* 2 Cl.Ct. at 237. Regarding *Kinnett Dairies,* the claim must be filed before the contract is awarded.

Accordingly, Systems rejoined in its reply that the BOA was negotiated and submitted "in anticipation of the award of a contract and the implementing delivery orders for various phases of the R & D AMS program which have and continue to be awarded to other companies." Plf's Reply, filed Apr. 15, 1983, at 3. In addition, because of the follow-on procurement activities under the R & D AMS program, including the cancellation of several requests for proposals to which Systems had responded, Systems alleged that it had vested interests under these proposals and attendant implied-in-fact contracts. *Id.* Thus, it is contended, given that Systems continues to compete for awards under the R & D AMS program, jurisdiction is present to enjoin activities preceding the contract award at the behest of a party with the requisite interest in the contract(s) to be awarded.

Systems would extend this court's equitable jurisdiction to complaints by a contractor which endeavors to respond to future, unspecified procurements alleged to be undertaken in derogation of a prior award to the contractor. Systems does not claim that, absent its R & D AMS contract, a cause of action lies against the Air Force for bid preparation costs in connection with any pending follow-on procurement activities under the R & D AMS program. Nor does Systems claim that the Air Force's action with respect to any such pending

procurement in response to which Systems has submitted a proposal lacks a rational basis or that the Air Force is violating applicable statutes or regulations in pending follow-on procurement activities to which Systems has responded. *See Harris Data Communications, Inc. v. United States,* 2 Cl.Ct. at 237 (citing cases). Satisfaction of the Air Force's R & D AMS requirements through contracting with vendors other than Systems is branded unlawful, however, because the Air Force has failed to publicize its actions or to seek competition, as mandated by the procurement statues. Plf's Reply at 4.

Systems' second supplemental memorandum cites *P. Francini & Co. v. United States,* 2 Cl.Ct. 1 (Cl.Ct.1983) (WHITE, S.J.) ("*Francini I*"), wherein the prior award and termination of its contract after suit was filed did not bar the contractor's challenge to the cancellation of an Invitation for Bids ("IFB"), pursuant to which its contract had been awarded. The contractor, a bidder under the IFB, sued to prevent award of the contract to another bidder. After the contract was awarded to plaintiff and thereafter terminated, the contractor sought leave to file a complaint to have the cancellation of the IFB set aside as unlawful and to prevent a resolicitation for bids. In allowing the supplemental complaint, Senior Judge White pointed out that no contract was outstanding and that a contract award definitely was proposed. 2 Cl.Ct. at 6. In a later decision, the agency action was upheld. *P. Francini & Co. v. United States,* 2 Cl.Ct. 7 (Cl.Ct.1983) (WHITE, S.J.). *Grimberg* would not pose a bar only insofar as plaintiff in *Francini I* filed its action prior to contract award. The jurisdictional difficulty in *Francini I* is

that plaintiff sought to enjoin a resolicitation based on violation of procurement regulations in cancelling the former RFP under which its contract had been awrded; plaintiff obviously was not a bidder under the proposed resolicitation. *See Control Data Corp. v. Baldridge,* 655 F.2d 283, 293 (D.C.Cir.1980), *cert. denied,* 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981).

The similarity in this case and *Francini I* is that the contracts awarded to Francini and Systems no longer exist—Francini's was terminated and Systems' expired.[10] Even if plaintiff in *Francini I* stated a claim within the court's jurisdiction after the Federal Circuit's decision in *Grimberg,*[11] the case is distinguishable because plaintiff in *Francini I* filed suit before award of its contract and sought to block an identified procurement. Systems, however, filed after award of its contract and seeks access to information identifying future or unknown pending procurements, so that it can either 1) challenge any such procurements as in derogation of Systems' rights under the subject contract or 2) respond to the proposals and then challenge them for infractions of statutes or regulations or based on irrational agency action. The first hypothesis sounds in breach of contract; the second is pure speculation.

With respect to the first, Systems' claim is as stated in ¶ 7 of its complaint—a charge that, unless enjoined, the Air Force will continue to award other contracts to other companies in violation of section 8(a) of the Small Business Administration Act and applicable regulations. This is a claim that the Air Force's follow-on past, pending, and projected procurement activities to fulfill its R & D AMS requirements pro-

10. The court notes Systems' view that the Air Force improperly failed to exercise the second-year renewal option and Systems' characterization of that action as a "constructive termination of plaintiff's express contract." Plf's Reply at 2.

11. The precise nature of Systems' standing was explored in oral argument. Defendant characterized Systems as seeking to bar the Air Force

from buying on an interim basis equipment and services that would be covered by the contract which Systems and the Air Force at present are negotiating. Systems agreed that it is negotiating, but argued that it should be in the same position as the other vendors with which the Air Force deals. Systems thus concedes that in this posture it is not a bidder on a pending proposal or procurement.

gram breach the subject contract.[12] *See Inland Container, Inc. v. United States,* 206 Ct.Cl. 478, 512 F.2d 1073 (1975); *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521 (1961). Consequently, because Systems is not a bidder with respect to any contract that is yet to be awarded, this is not a case that is otherwise in this court's jurisdiction as to which section 1491(a)(3) enables complete relief to be afforded by way of injunction.

With respect to the latter hypothesis, the court cannot lend its discovery procedures in a pre-award injunction suit for the purpose of revealing procurement actions and thus enable the complaining contractor to submit a proposal and thereafter challenge the procurement as unlawful or irrational. Allowance of such discovery would place the court in the position of creating a claim, whereas our injunctive jurisdiction derives from the existence of a claim that the court is empowered to hear. If the unlawful activity Systems suspects actually is occurring, Systems can obtain discovery in aid of its breach claim, when brought in the proper forum, and thereby augment any relief to which it may be entitled.

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss Count I of the complaint is granted, plaintiff's motin for preliminary injunction is denied, and the complaint will be dismissed based on lack of jurisdiction of the subject matter.

Costs to the prevailing party.

IT IS SO ORDERED.

---

12. At oral argument Systems suggested that, as with *Francini I,* wherein the alleged violation of procurement regulations in cancelling the IFB provided the basis for jurisdiction, Systems' prior express contract could well serve in establishing jurisdiction with respect to contracts yet to be awarded. After *Francini I* the court should not look to whether a contract has been awarded, Systems argues, but to whether the procurement sought to be enjoined is the same as that covered by the previously awarded contract. Because Systems ignores the distinction between a suit filed before contract award (*Francini I*) and one post award (*Grimberg*), this approach runs afoul of *Grimberg* and must be rejected.